[No. 51464-0. En Banc. October 2, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. BENJAMIN JAMES HARRIS III, *Appellant.*

*Benjamin J. Harris III*, pro se, and *Murray J. Anderson* (of *Anderson & Anderson*), for appellant.

*William H. Griffies, Prosecuting Attorney,* and *Chris Quinn–Brintnall, Senior Appellate Deputy,* for respondent.

DOLLIVER, C.J.—Defendant was sentenced to death on one count of aggravated first degree murder. The killing occurred pursuant to a contract; both the defendant and the person he offered to pay performed the killing. Defendant challenges the trial court's imposition of the death penalty.

Jimmy Lee Turner was found shot to death outside his home on June 14, 1984, in Tacoma, Washington. He had been shot in the head and the neck. The Tacoma Police Department (TPD) began an immediate investigation into the shooting.

Later, on the same day, defendant Harris called Sergeant Parkhurst of the TPD and asked if Parkhurst had heard

rumors of defendant being involved in the homicide. On the same day, the police obtained an oral statement from Raymond E. Meeks who stated he had had conversations with defendant Harris and codefendant Bonds regarding Bonds' acceptance of a contract from defendant Harris to kill certain persons.

Over the next 2 weeks, the investigation continued with the TPD hearing that defendant Harris, among other people, might have been involved in the shooting. On July 2, 1984, Detective Bowen and Sergeant Parkhurst went to Harris' home to talk with him about the homicide. The officers were invited in by defendant who voluntarily talked to them about Turner. Defendant was not advised of his rights but would not have been detained or arrested had he refused to talk to the police.

On July 17, 1984, defendant called Sergeant Parkhurst and said he would give the police the name of a suspect in the Turner homicide. Defendant also asked two favors of the police: (1) to be furnished with two guns for protection; and (2) for a conversation with Meeks, then in the county jail. Defendant came to the county jail on July 18, 1984, and was allowed to talk with Meeks (he was not given any guns).

After defendant's visit with Meeks, he told police he was with codefendant Bonds the evening of the killing. No *Miranda* warnings were given. The police then talked with Meeks who signed a formal statement implicating defendant in Turner's death. This statement was corroborated by Valerie Stevens.

On July 19, 1984, defendant went to the TPD and was interviewed again. Prior to any questioning, defendant was advised of his *Miranda* rights. Following the questioning, defendant was allowed to leave. Defendant continued to call Sergeant Parkhurst. Defendant was subsequently arrested as a material witness and released on personal recognizance. On August 8, 1984, defendant was arrested as a suspect in the Turner killing.

On August 10, 1984, defendant was arraigned on charges

of aggravated first degree murder. He pleaded not guilty. On September 20, 1984, a CrR 3.5 hearing was held to determine admissibility of defendant's inculpatory statements made to police prior to July 19, 1984. The trial court concluded all statements made by defendant prior to July 19, 1984, were admissible.

An order was entered, at defense counsel's request, on September 28, 1984, enabling defendant to be examined at Western State Hospital. While at Western State Hospital, the examining psychologist, Dr. Kathleen Mayers, performed three psychological tests on the defendant: (1) Minnesota Multiphasic Personality Inventory (MMPI); (2) Rotter Incomplete Sentences Blank; and (3) Rorschach Diagnostic Procedure. In her report dated October 8, 1984, Dr. Mayers stated defendant was competent to stand trial. The MMPI was completed but not scored.

Trial was originally set to begin on October 15, 1984, but defendant obtained a 1–week continuance: (1) because defense counsel was in another trial; and (2) to allow the defendant to be examined by a psychological expert of the defendant's own choosing. Defendant did not, however, retain a private psychological expert. On October 29, 1984, the jury returned a verdict finding defendant guilty of aggravated murder in the first degree. On October 31, 1984, the same jury was convened for the sentencing phase of trial. The prosecutor advised defense counsel about the unscored MMPI just prior to the commencement of the sentencing phase. Discovery of the unscored MMPI had been made by the prosecutor on October 30, 1984. No psychological data was presented to the jury as mitigating circumstances. The jury determined there were not sufficient mitigating circumstances presented to merit leniency.

On November 5, 1984, the trial court granted a continuance of the sentencing date to allow the defense to file a motion for a new trial based on new evidence, including the unscored MMPI. Defendant was allowed access to State and defense psychologists, Kathleen Mayers and Allen Traywick, during this continuance. Both Dr. Mayers and

Dr. Traywick diagnosed defendant as having an antisocial personality with paranoid disorder. Dr. Mayers testified that her second evaluation added no additional information to her original evaluation.

The trial court denied the defense motion to arrest judgment or for a new sentencing trial and imposed judgment and the death penalty on defendant on January 14, 1985. The case is before the court on direct review. RAP 4.2(a)-(6). We affirm the trial court's decision and, thus, as we are required to do by law, uphold defendant's sentence of death.

Defendant raises several issues regarding his death sentence, each of which we have considered and which we now discuss.

I

Defendant argues the police should have issued *Miranda* warnings to him for all statements made after July 2, 1984, and prior to July 19, 1984, because their investigation had focused sufficiently on him as a suspect shortly after Turner's death. The State responds that defendant voluntarily gave information to the police and was not the focus of the investigation until the police received sworn written statements from Raymond Meeks and Valerie Stevens.

*Miranda* warnings were developed to protect a defendant's right not to make incriminating confessions or admissions to police while in the coercive environment of police custody. *State v. Dictado*, 102 Wn.2d 277, 292, 687 P.2d 172 (1984). If warnings are not given when applicable, the statements made by a suspect may be inadmissible at trial. *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975).

The United States Supreme Court recently has elucidated the test for determining when *Miranda* safeguards exist. "[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 82 L. Ed. 2d 317, 104 S. Ct.

3138, 3151 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983)). The *Berkemer* test modifies the "probable cause to arrest" standard used by this court to determine when *Miranda* safeguards are required. *State v. Dictado, supra.* Thus, persons voluntarily accompanying police to the police station as material witnesses are not under custodial interrogation if their freedom of action is not curtailed to a degree associated with a formal arrest. *See State v. Green,* 91 Wn.2d 431, 94 Wn.2d 216, 588 P.2d 1370, 616 P.2d 628 (1980).

■ Defendant's circumstances regarding his statements at issue do not appear to give rise to *Miranda* safeguards. Defendant did not challenge any of the trial court's findings of fact at his CrR 3.5 hearing and, therefore, the court's findings are taken as verity. *State v. Christian,* 95 Wn.2d 655, 628 P.2d 806 (1981). Defendant initiated contact with the TPD after Turner's death. During the few interviews between defendant and the TPD, prior to July 19, 1984, defendant would not have been arrested or curtailed even if he had refused to cooperate. These talks do not appear to have limited defendant's freedom of action to a degree associated with formal arrest, thus *Miranda* warnings were not required.

## II

Defendant next claims that because his alleged aggravating act, RCW 10.95.020(5), requires a contract between two people, codefendant Bonds' subsequent acquittal of the similar aggravating act relieves defendant of his aggravating circumstances. The State argues that defendant's theory is misplaced and inappropriate.

■ For his argument, defendant relies on the common law rule set out in *State v. Henry,* 143 Wash. 39, 254 P. 460 (1927). This rule applies to crimes, such as conspiracy, which can be committed only by several persons jointly. Under this rule, if the one defendant is convicted and the other subsequently acquitted, the conviction must be dis-

missed. *State v. Henry,* at 42–43. The Legislature, however, has spoken to this issue and has specifically exempted its application to the crime of conspiracy. RCW 9A.28.040-(2)(d) (1975).

Even more persuasive is RCW 9A.08.020(6) (1975), which would hold defendant Harris legally accountable for the conduct of codefendant Bonds even if Bonds were to be subsequently acquitted:

A person legally accountable for the conduct of another person may be convicted on proof of the commission of the crime and of his complicity therein, though the person claimed to have committed the crime has not been prosecuted or convicted or has been convicted of a different crime or degree of crime or has an immunity to prosecution or conviction *or has been acquitted.*

(Italics ours.) Where RCW 9A.28.040(2)(d) applies specifically to the former common law rule regarding conspiracy, RCW 9A.08.020(6) signals the Legislature's intent to find a defendant guilty of a crime even if the other person is acquitted. Defendant's contention is without merit.

### III

Defendant claims the trial court's admission of exhibit 3, a photograph showing the victim lying in a pool of blood, was prejudicial and outweighed any probative value when admitted together with exhibit 7, an autopsy photograph of the victim. The State asserts the photograph was necessary to convey critical information and the trial court properly exercised its discretion admitting it.

The result of a trial court's balancing of the probative value of admitting evidence as against the prejudicial effect on the jury is reviewed by this court only for abuse of discretion. *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985). Photographs, even if gruesome or unpleasant, are admissible if the trial court finds their probative value outweighs their prejudicial effect. *State v. Jones,* 95 Wn.2d 616, 628 P.2d 472 (1981). The Court of Appeals recently upheld the admission of a particularly gruesome photograph because it revealed conditions at the scene of the

killing, the damage to the victim, and it rebutted defendant's claim of self–defense or accident. *State v. Hatley,* 41 Wn. App. 789, 706 P.2d 1083 (1985).

Defendant claims exhibit 3 was entered for no reason other than to inflame the jury's passion. Unless it is clear in review of the record that the primary reason to admit exhibit 3 was to inflame the jury's passion, this court must uphold the trial court's decision. *State v. Jones, supra.*

The trial court stated in support of its decision to admit exhibit 3 that it was appropriate to admit at least one photograph of the victim at the scene of the killing. The State claims the photograph at issue shows surprise on the victim's face, consistent with a sneak attack and contrary to defendant's testimony that he intended to converse with the victim to get his money back for faulty car repair work.

The photograph shows a dead person lying in a pool of blood; the victim's face arguably does not show any particular expression of surprise. However, deference is given to the trial court's determination of admissibility if the record supports its decision. It does; there is no error.

## IV

An admission of an out–of–court statement violates a defendant's Sixth Amendment right to confront adverse witnesses if the declarant is available but the defendant is denied the opportunity to cross–examine. *State v. Guloy, supra* at 425. The constitution does not, however, forbid self–incrimination. *State v. Dictado,* 102 Wn.2d 277, 293, 687 P.2d 172 (1984).

Defendant claims his statement admitted as exhibit 15 is inadmissible because reference was made to a comment of codefendant Bonds that he "takes contracts and has bumped off some people in California." However, the statement admitted was a sworn statement made by defendant himself. Thus, *Guloy* is inapplicable because the statement is not an out–of–court statement made by an adverse witness. There is no error.

## V

Defendant contends RCW 10.95.070 provides no guidance for the trial court or jury to determine whether a defendant merits leniency. This court dealt specifically with this issue in *State v. Campbell,* 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985). In *Campbell,* we held the State's statutory standard is not unconstitutionally vague and gives proper guidance to the jury and affords the defendant a basis for a sentence less than death. *Campbell,* at 28.

■ We have held that the term "mitigating circumstances" need not be specifically defined so long as instructions adequately guide the jury as to the nature and function of mitigating circumstances. *State v. Bartholomew,* 101 Wn.2d 631, 647, 683 P.2d 1079 (1984) (*Bartholomew* II). In this case, the court provided the following instruction to the jury regarding the nature of mitigating circumstances:

A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.

The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the state has proved beyond a reasonable doubt that the death penalty is warranted.

You are also to consider as mitigating circumstances any other factors concerning the defendant that you find to be relevant.

Instruction 3.

This instruction satisfies the standard required in *Bartholomew* II.

## VI

■ Defendant asserts the prosecutor's discretion to seek the death penalty under the State's death penalty statute violates his constitutional right of equal protection. We have held to the contrary. *State v. Campbell, supra* at 25;

*State v. Dictado, supra; State v. Rupe,* 101 Wn.2d 664, 699, 683 P.2d 571 (1984). There is no constitutional defect when the prosecutor has discretion to charge crimes which have different elements. *State v. Campbell, supra.* Prosecutorial discretion regarding the decision whether to seek the death penalty presents no equal protection problem because a sentence of death requires consideration of an additional factor, absence of mitigating circumstances. *State v. Campbell, supra.*

As long as the statutory discretion provides guidance to the prosecutor with requirements of proof and consideration of the State's ability to meet them, there is no equal protection problem. *State v. Dictado, supra* at 297. Here, the statute was applied as intended; the trial court found the prosecutor had carried out his duty. There is no equal protection violation.

## VII

Defendant argues the trial court erred when it failed to grant his motion for arrest of judgment or for a new trial. He claims he is entitled to present evidence of the following mitigating factors: (1) "newly discovered evidence" of the mental illness of the defendant; (2) the inconsistent statements of the State's material witness, Raymond Meeks; and (3) the subsequent acquittal of codefendant Bonds.

CrR 7.6 sets out the grounds for granting a new trial including "[n]ewly discovered evidence material for the defendant, which he could not have discovered with reasonable diligence and produced at the trial". CrR 7.6(a)(3). In *State v. Williams,* 96 Wn.2d 215, 634 P.2d 868 (1981), we listed five factors for a court to consider when granting a new trial based on new evidence. The new trial will not be granted unless the moving party demonstrates that the evidence: (1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before the trial by exercise of due diligence; (4) is material; and (5) is not merely cumulative (additional evidence of the same kind to the same point). *Williams,* at

223. The absence of any one of these five factors is grounds for denial of the motion for a new trial. *State v. Williams, supra.*

Here, the only matter of real consequence is the evidence regarding defendant's mental state. We have examined the other two issues raised by defendant and find them to be without merit. The trial court correctly found no substantive change in the testimony of Weeks; we previously have covered the issue of Bonds' acquittal. No further discussion is necessary.

On the matter of defendant's mental state, he had been granted an evaluation at Western State Hospital to determine his competency and sanity. Dr. Mayers, the psychologist evaluating the defendant pursuant to the court's order, administered a variety of tests to the defendant. Even though one of the tests, the Minnesota Multiphasic Personality Inventory (MMPI) test, was completed and not scored, Dr. Mayers felt satisfied with her evaluation of defendant based on the other tests. She provided a report on her results to defendant on October 8, 1984.

Defendant did not find out, nor did he inquire, about the unscored MMPI test until just prior to the commencement of the sentencing phase on October 31, 1984. Defendant did not retain a private psychological expert prior to the sentencing phase and presented no psychological evidence to the jury during the sentencing phase.

The trial court continued the sentencing of defendant to ascertain whether the MMPI test results could be considered "newly discovered evidence" thereby requiring a new sentencing trial. After a subsequent evaluation of defendant's MMPI test results, Dr. Mayers stated unequivocally that no change would be made in her original evaluation of defendant based on the ultimate result of the MMPI. She further stated there was nothing she would have changed in her October 8, 1984, report had she scored the MMPI prior to writing that report.

Defendant's psychologist, Dr. Traywick, testified the MMPI was the only test administered to defendant that

picked up the delusional system discovered by Dr. Traywick during his interviews with defendant. Although he testified defendant's delusions appeared to have nothing to do with the deceased, Jimmy Lee Turner, when questioned, Dr. Traywick stated he believed defendant to be both sane and competent. Finally, Dr. Traywick, in reference to a question as to whether his assessment of defendant "differ[ed] markedly from her [Dr. Mayers'] assessment", testified:

I believe that we're essentially talking about the same thing. It may be, perhaps, placing a bit more weight on the delusional system than Doctor Mayers. But I don't think there's that much difference between what we're talking about.

The trial court held, after hearing all the testimony regarding the circumstances surrounding the psychological testing, that all of the subsequent psychological information "was available to [the defense], could have been presented to the jury, had the matter been pursued at an earlier date."

The Supreme Court has stated that the "imposition of death by public authority is . . . profoundly different from all other penalties". *Eddings v. Oklahoma,* 455 U.S. 104, 110, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978)). For this reason, the Court held a sentencer should not be precluded from considering as a mitigating factor, any aspect of a defendant's character the defendant proffers as a basis for a sentence less than death. *Eddings v. Oklahoma, supra.* The Court has held there is a need for treating each defendant in a capital case with a degree of respect because the uniqueness of the individual is far more important than in noncapital cases due to the unavailability of postconviction mechanisms. *Lockett v. Ohio, supra* at 605. However, a line needs to be drawn on what is newly discovered evidence. As the trial court stated, anyone can go out and get "new" psychological evaluations and claim they have important mitigating circumstances.

■ There is no question regarding the importance of a defendant's ability to present any relevant evidence as potential mitigating factors to a jury. However, the psychological evidence claimed by defendant in the present case as "newly discovered" easily could have been gathered, discovered, and presented to the jury. Hindsight on the part of defendant's trial strategy does not rise to the standards necessary for a new trial. Even under a review of stricter scrutiny and giving defendant the benefit of every doubt, the claimed evidence can neither be considered "newly discovered" nor is it in fact any different in substance than that which was available to defendant at the time of the trial and the penalty hearing.

## VIII

Although the United States Supreme Court no longer requires proportionality review for a statutory scheme imposing a death penalty, it still considers such review as an additional safeguard against arbitrarily imposed death sentences. *Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). As stated recently, the decision as to whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case has long been viewed as one an appellate court is fully competent to make. *Cabana v. Bullock*, __ U.S. __, 88 L. Ed. 2d 704, 106 S. Ct. 689 (1986). Our state statute requires a review of whether the death penalty assessed was excessive or disproportionate when compared to penalties imposed in similar cases, considering both the crime and the defendant. RCW 10.95.130(2)(b).

The determination in this review is whether the death penalty is unacceptable because it is disproportionate to the punishment imposed on others convicted of the same crime. *State v. Campbell*, 103 Wn.2d 1, 30, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985). The impetus for proportionality review derives from the Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). The Court appears to have felt a

need for some basis to distinguish between those defendants who are sentenced to death and those who are not. Our statute merely provides this court assure the death sentence imposed is not excessive or disproportionate. This language, however, provides little guidance to determine at what point a death sentence becomes proportionate or disproportionate.

 The language in our statute is identical to that used in the Georgia statute and most of the other statutes which expressly provide for proportionality review. *See* Ga. Code Ann. § 17–10–35(c)(3) (1982). Thus, Georgia's interpretation may be helpful as a guideline to this court. In Georgia, the test for proportionality is whether death sentences have been imposed "generally" in similar cases. *Moore v. State,* 233 Ga. 861, 213 S.E.2d 829 (1975).

> [T]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not "wantonly and freakishly imposed," . . .

(Italics ours.) *Moore,* at 864 (quoting *Furman v. Georgia, supra* at 310 (Stewart, J., concurring)). However, as Justice Utter points out in *State v. Jeffries,* 105 Wn.2d 398, 431, 717 P.2d 722 (1986) (Utter, J., dissenting), in viewing our State's application of this review, it is also unclear what "similar cases" means.

Reviewing the "similar cases" pursuant to RCW 10.95-.130(2)(b), there have been no cases reported in the Washington Reports or the Washington Appellate Reports which considered the imposition of capital punishment for a contract killing. Therefore, there is no evidence to be considered whether the present case is disproportionate to previous cases. There have been only three capital cases involving a contract as the aggravating factor since 1981 and filed with the Clerk of the Supreme Court pursuant to

RCW 10.95.120. See State v. Mitchell, King County cause 83-1-02643-8 (Apr. 23, 1984); State v. Manthie, Kitsap County cause 82-1-00003-3 (Dec. 6, 1983); and State v. Edmondson, Kitsap County cause 82-1-00244-3 (Mar. 22, 1983). In each case, no death penalty was sought by the prosecutor. The judge in Manthie said if the State had requested the death penalty it would have gotten it. State v. Manthie, *supra.* These three Washington cases appeared clearly to be contract cases; a person solicited another to commit a murder and that person committed the murder. Here, the trial jury found beyond a reasonable doubt that defendant contracted with Bonds to have the victim killed. The defendant went on to commit the killing with the person he allegedly hired to do the killing, and they both shot the victim.

We are satisfied the imposition of the death penalty was not "wantonly or freakishly" imposed. No errors were made in the guilt and sentencing phases of defendant's trial; the trial court made every effort to ensure the defendant trial proceedings that were fair and just. Unlike the other defendants charged with a contract killing, defendant had received a 1-year prison sentence for a prior manslaughter charge. The other defendants' comparable records showed little, if any, prior records that rose to the seriousness of defendant's. Furthermore, as the prosecutor points out, the aggravated factor pleaded and proved was that Bonds had killed Turner pursuant to a contract with Harris to kill a series of people of whom Jimmy Lee Turner was the first.

This court's review of proportionality is a difficult one. The issue before us is not whether to release defendant to society, but whether the trial court's decision to sentence him to death was disproportionate or excessive when compared to similar cases. The Legislature has determined that a "contract" killing is an aggravating factor sufficient for the execution of the perpetrator. Defendant decided not to present any psychological data as mitigating factors in his sentencing trial and the jury determined the mitigating factors presented were not sufficient to justify leniency.

We also have reviewed the pro se supplemental brief of defendant. Nothing contained therein merits further comment or response.

There is no error; the conviction and death sentence of Benjamin James Harris III are consistent with the legal standards and are, therefore, affirmed.

BRACHTENBACH, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

DURHAM, J. (concurring)—I agree with the majority opinion, but I believe that section VII, dealing with the defendant's motion for a new trial, is misleading. In affirming the trial court, the majority relies on the fact that "the psychological evidence claimed by defendant in the present case as 'newly discovered' easily could have been gathered, discovered, and presented to the jury." Majority opinion, at 797. I believe this unnecessarily calls into question trial counsel's judgment and trial strategy.

The evidence in question is a Minnesota Multiphasic Personality Inventory (MMPI) which was administered to the defendant by Dr. Mayers at Western State Hospital. The majority states that the test was completed by the defendant, but not scored. This is not entirely accurate. As Dr. Mayers testified:

A The Minnesota Multiphasic Personality Inventory was initially administered to Mr. Harris. However, he misplaced or lost the test.
THE COURT: Who did?
WITNESS: Mr. Harris.
Q While he was at Western State?
A Yes, sir. He accused another patient of stealing it from him, I then gave him another form to complete and checked on him repeatedly, however, it took a great deal of time for him to complete it, along with the Rotter Incomplete Sentences blank. He completed the Rotter Incomplete Sentences blank, and I looked at it immediately and evaluated its contents.
While I, repeatedly, asked him when he was going to finish the MMPI, he indicated that he was having some

difficulty completing it and, indeed, it is a very lengthy test.

Because hospital personnel were quite anxious to have him return to jail as soon as possible, because of concerns about security risk, I administered the Rorschach Diagnostic Procedure, as a more rapid way to determine the presence or absence of any psychotic symptoms.

Q The Rorschach Test was then ten—

A Ink–blots. Upon administering the Rorschach, I scored it at once. Upon giving the test, I assessed the presence or absence of any psychotic symptoms. It was immediately apparent that there was none. At the point, the question which I was attempting to answer by the test, which is the presence or absence of psychosis, was answered for me, so that I wrote the letter to the judge.

At that point, Mr. Harris still had not completed the MMPI. But at that point, the information was irrelevant in that I had obtained better information, I felt, as to the presence or absence of psychosis.

*He did, finally, indicate that he had completed the MMPI, however, in fact he had left a number of the items blank.*

Q There's about some 560 or 530 questions in that?

A A great many questions, yes, sir. *I finally did receive the MMPI, and he had gone through the whole test, he had missed a number of items, and in addition the test result was invalid.* I did not score that test, however, until after the letter to the judge had been written and sent, because the information was of no particular import in that the question that I had been attempting to answer had in fact been answered by what I considered to be a better, more appropriate test.

(Italics mine.) Report of Proceedings, at 734–36.

Later, referring to defense counsel's claim of an incomplete diagnosis of defendant, the following colloquy occurred:

THE COURT: What was incomplete about it?

MR. ANDERSON: The failure to score the Minnesota Multiphasic.

THE COURT: Was it completed before the second phase of the trial?

WITNESS: Was it scored? Or was it—
THE COURT: Was it completed by the—
WITNESS: *He hadn't even completed the test, at that point. He never did complete that test for me.*

(Italics mine.) Report of Proceedings, at 745.

Finally, and of critical importance, is Dr. Mayers' testimony regarding the results of the MMPI once it was scored:

THE COURT: When was it scored?
WITNESS: It was scored after Mr. Felnagle called and said, "Is there any other information?"
THE COURT: And when did he call?
WITNESS: He called at 3:30 the night before the sentencing phase, as I understand it.
THE COURT: At that time it had been completed? Or at least as complete as it was ever to be?
WITNESS: Well, it had not been completed by Mr. Harris. Is that what you mean?
MR. ANDERSON: We're not talking about scoring now.
THE COURT: It hadn't been completed. It was never completed. Is that it?
WITNESS: *That's correct. It was never completed. It was scored, but the scoring indicated it was invalid and useless.*

(Italics mine.) Report of Proceedings, at 746.

I am unaware of any authority which would allow a new trial based on evidence which is incomplete, invalid and useless.

GOODLOE, J., concurs with DURHAM, J.

UTTER, J. (dissenting)—I cannot agree with the majority's analysis of the report of capital cases required under RCW 10.95.130. A closer examination of similar cases suggests that, out of the pool of contract murderers, Harris has been capriciously selected to die. I have elsewhere, *see State v. Campbell,* 103 Wn.2d 1, 42, 691 P.2d 929 (1984) (Utter, J., dissenting), *cert. denied,* 471 U.S. 1094 (1985) and *State v. Jeffries,* 105 Wn.2d 398, 429–30, 717 P.2d 722 (1986) (Utter, J., dissenting), discussed at length the problems attending a proportionality review under our statute.

Assuming arguendo that those problems have been overcome, I will address only the statute's application to the facts of this case.

One of the problems in such an analysis is the dearth of relevant cases. Nevertheless, comparison with the contract murder cases discussed by the majority dramatizes the unchecked discretion the prosecutor enjoys. Two cases, State v. Manthie, Kitsap County cause 82-1-00003-3 (Dec. 6, 1983), and State v. Edmondson, Kitsap County cause 82-1-00244-3 (Mar. 22, 1983), involve a woman (Edmondson ) who solicited her ex-husband (Manthie) to kill her present husband. In his RCW 10.95.120 sentencing report (Report), the Edmondson trial judge recounted the grisly details of the murder:

> Richard Manthie, the defendant's ex-husband, inflicted the harm prior to death, and caused the death. The known physical harm was a badly broken nose resulting from a kick to the face. Later, Manthie shot the victim four times in the head; the victim apparently never regained full consciousness after the first shot. Following the four shots, Manthie stomped the victim's chest in.

Report, at 8. The Manthie report observes that Manthie, while imprisoned in Montana, had been diagnosed as having an "anti-social personality with a violent temper." Report, at 3. The Report further notes that Manthie had been convicted and imprisoned for three different offenses (felony criminal mischief, burglary, and DWI) in the 2½ years preceding the murder. This was in addition to "multiple juvenile offenses" he was known to have committed. Report, at 3. The Manthie trial judge observed, "[i]f the State had requested the death penalty it would likely have been imposed in my opinion." Report, at 13.

In another case cited by the majority, State v. Mitchell, King County cause 83-1-02643-8 (Apr. 24, 1984), the defendant's actions were even more grisly and appeared to have been carefully planned.

> The victim had been badly beaten and had been strangled. His neck was broken. He had been shot twice, once

in the chest and once in the head. A pillow had been used to muffle the sound of the shot in the head. The victim's slacks were below his knees, the zipper and catch undone and his belt torn open. His hands and feet were bound with telephone cord and strapping tape. The tape was wound several times around his neck with a washcloth at his neck held by the tape. The washcloth was apparently a gag. The tape then extended to his hands and feet.

Report, at 8.

Because the prosecutor did not seek the death penalty, there was no special sentencing procedure to weigh the aggravating and mitigating factors. Nevertheless, the trial judge observed "that the crime was brutal and premeditated committed without provocation for the sole purpose of obtaining money or property. . . . [T]here was no indication of mitigating factors such as mental illness." Report, at 13. The Report also shows that in the 3½ years prior to committing this crime, Mitchell had been fined or imprisoned four separate times for possession of stolen property, false reporting, false reporting and obstructing, or carrying a concealed weapon. Report, at 3.

To further expand the sample, I would look to the murder of two cannery union reformers in which three individuals were convicted of aggravated murder and in none of the cases did the prosecutor seek the death penalty. See State v. Guloy, King County cause 81–1–01924–9, State v. Ramil, King County cause 81–1–01924–9; State v. Dictado, King County cause 81–1–02795–1. As the trial judge observed in the Ramil and Guloy cases, the reformers had been elected to change the corruption conditions in the union. Ramil Sentencing Report, at 13. The murderers sought to protect their interests in that corrupt system. That both Ramil and Guloy received a life sentence was deemed "Appropriate [because] the Motive, Planning, and Commission of these Double Murders [had been] for Selfish and Corrupt Objectives." Guloy Sentencing Report, at 13. The trial judge in State v. Dictado did not comment on the appropriateness of Dictado's sentence.

The case before us reveals neither the calculation nor the

brutality found in the above cases where the death penalty was not even sought. The trial judge indicated that Harris did not engage in an obvious contract killing, even though the "contract" was the aggravating factor cited to justify executing the defendant. The motive for the killing is unclear, as is the source of funds from which the "offeree" was to receive payment. Report, at 13. *See also* Report of Proceedings, at 593–98. Most peculiar, however, is the fact that the defendant was involved in the actual murder. This hardly reflects the usual calculation associated with a contract murder. The pattern is even more anomalous because Harris's alleged offeree, Gregory Gay–Gay Bonds, was acquitted of the same murder charge in a later trial. There is the powerful suggestion that the State's key witness in both cases, a local heroin pusher and addict, became much less cooperative before the second trial because of two new charges brought against him in the interim—rape and murder. Report of Proceedings, at 777, 793–94.

Even if one assumes the State's witness testified even-handedly, one is left with a contract murder in which there was only one party to the contract. This raises serious questions about the appropriateness of finding the aggravating factor, a contract, existed at all. All the more should one question the proportionality of the death sentence based on a putative contract in which one of the two parties is found not to have entered into the contract.

The capriciousness of the majority's result is heightened by the attention the majority pays to Harris's 1–year prison sentence for manslaughter. Majority, at 799. In comparing that record with the records of other defendants in the sample population, the majority determines that Harris's is uniquely serious. What the majority ignores, however, is the passage of time between Harris's single prior conviction (1969) and his present conviction (1984). In contrast, in the years preceding their capital crime, two of those convicted of the most violent of the above murders had been imprisoned several times for various offenses. Manthie's record shows "multiple juvenile offenses" some 7 to 9 years prior

to his murder conviction (1982), as well as burglary (1981) and felony criminal mischief (1979) convictions within 3 years of his murder conviction. Similarly, Mitchell shows four separate convictions within the 4 years prior to his murder conviction. The comparative relevance of Harris's 1–year sentence 15 years ago is attenuated at best.

In spite of these many incongruities, the majority concludes that Harris's death penalty "was not 'wantonly or freakishly' imposed." Majority, at 799. A proportionality review is required to demonstrate that. The majority's attempt at such a review fails the requirement. I dissent.

PEARSON, J., concurs with UTTER, J.

Reconsideration denied December 3, 1986.