[No. 15462-9-III.    Division Three.    January 13, 1998.]

THE STATE OF WASHINGTON, *Respondent,* v. THOMAS RICK BIRNEL, *Appellant.*

*Mark E. Vovos*, for appellant.

*James R. Sweetser, Prosecuting Attorney*, and *Kevin M. Korsmo, Deputy*, for respondent.

SCHULTHEIS, C.J. — Rick Birnel stabbed his wife Mary 31 times. He was charged with second degree murder and he claimed self-defense. The jury found him guilty. After finding that the victim participated in the crime, the trial court sentenced Mr. Birnel to 60 months, less than one-half the standard range sentence. On appeal, he contends the trial court erred (1) in admitting statements he made on the night of the incident; (2) in excluding evidence of Ms. Birnel's violent behavior; (3) in giving the jury improper self-defense and aggressor instructions; and (4) in refusing to grant a new trial for juror misconduct. He also contends he had ineffective assistance of counsel. The State cross-appeals the exceptional sentence. We reverse and remand for retrial.

### FACTS AND PROCEDURAL POSTURE

Rick and Mary Birnel were married about 13 years. The couple had four children during their marriage, two of whom Mr. Birnel fathered. Early in their relationship, both Mr. and Ms. Birnel were heavy drinkers and drug users. Mr. Birnel stopped abusing liquor and drugs after his second child was born, but Ms. Birnel continued and began using methamphetamine. Her behavior, always assertive, became increasingly irritable and occasionally violent.

In 1992, Mr. Birnel moved out of the family home, but continued to visit the children and take them to appointments or school. He supported the family financially and

slept at the house about twice a week to be near the children.

On March 29, 1995, Mr. Birnel visited his wife's house to attend his daughter's 10th birthday party. After the party, Ms. Birnel left to run errands and Mr. Birnel settled to sleep on the living room floor with the younger children. A few unrelated children were staying with Ms. Birnel at the time and were sleeping either in the basement or upstairs. According to his testimony at trial, Mr. Birnel was awakened very early the next morning by the sounds of Ms. Birnel washing dishes and clothes and watching television. He also heard her making "chopping" sounds in the bathroom, and suspected she was taking methamphetamine. After she went downstairs, he went up to look for drugs, went through her purse, and found what he was looking for. He decided to confront her and waited at the top of the stairs.

When Ms. Birnel returned, her husband asked if she was taking drugs and if that was where all her money was going. She answered no and then stated, "You've been in my fucking purse again." Mr. Birnel told her to make a list of the bills owed. She responded angrily, "You've pushed me too far." She then ran down to the kitchen, rummaged around, and came back with a large knife in her hand. Mr. Birnel, who was still sitting on the floor when she ran up, tried to rise, but fell over with his wife on top when she attacked him. He grabbed her hands and the two began rolling and wrestling, Ms. Birnel screaming the entire time. At one point, Mr. Birnel saw his 10-year-old near the struggle and got up to push her away. He later claimed that as he turned to face his wife, she rushed him again with the knife, the two fell over, and somehow during the struggle she was stabbed in the back. In the end, he left his wife lying on her back at the top of the stairs, the knife embedded five and one-half inches into her chest. He claimed that throughout the incident she usually controlled the knife and he acted in self-defense.

Mr. Birnel had one of the guests call 911 and gathered the children together to wait in the basement. When emer-

gency medical technicians arrived, they found Ms. Birnel dead and Mr. Birnel quietly sobbing. The first deputy who arrived saw that Mr. Birnel's hands were covered with blood. Seven or eight children were crying in the basement. The 10-year-old daughter was smeared with blood. While Mr. Birnel was held in a patrol car, the police began moving the children to a neighbor's house and securing the scene for investigation.

Deputy Mathew Lyons sat in the patrol car with Mr. Birnel. He was told that Mr. Birnel had not been Mirandized and was cautioned not to ask him any questions. As Deputy Lyons worked on reports from previous calls, he took notes of statements Mr. Birnel made during the hour and 20 minutes he sat in the car. At one point, Mr. Birnel exclaimed, "Oh, my kids. My poor kids. Now they're going to lose both parents." Later, he asked, "Will they search everything? Will they confiscate her purse?" Deputy Lyons said he did not know and Mr. Birnel said, "They'll find crank in her purse." Some time later, Mr. Birnel said, "There's no excuse. It shouldn't have gone this far. The kids shouldn't have had to see this." Eventually, Deputy Lyons noticed that Mr. Birnel had a serious cut on his hand and drove him to an emergency room.

Detective Michael Massong met Mr. Birnel at the hospital, told him he was in custody and told him he would be interviewed later. He did not advise Mr. Birnel of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966). The only questions Detective Massong asked Mr. Birnel were whether he had any other injuries besides the hand and whether he had had much sleep that night. Mr. Birnel responded that his wife had awakened him and that things had gone too far. He had a slight wound on one finger and one toe and a light cut on his right thigh. Only his hand wound required stitches.

Detective Massong and another officer took Mr. Birnel to an interview room in the Public Safety Building, informed him he was in custody on charges of second degree murder

and read him his *Miranda* rights. After Mr. Birnel stated he wanted to speak to his attorney, the other officer left to locate his counsel, who was reportedly enroute. Detective Massong began explaining the booking procedure but Mr. Birnel interrupted and began telling what had happened with his wife. The detective asked Mr. Birnel if he had changed his mind about seeking counsel. Mr. Birnel responded that he wanted to explain his side of the story and get witnesses.

According to Detective Massong, Mr. Birnel then began talking, first blaming the destruction of their marriage and his wife's death on her drug addiction. He explained that he was the mellow spouse and his wife was the violent one, especially when she was on drugs. He said she was on drugs at the time of the incident. After Mr. Birnel stated he confronted his wife about using bill money to buy drugs, Detective Massong asked if there was a bill problem. Mr. Birnel indicated there was no real problem. He then stated that when he confronted his wife, she "flipped out totally," got a knife and went after him. During the struggle, both of them had their hands on the knife, but mostly Mr. Birnel. He claimed that because Ms. Birnel was high on drugs, she was physically strong. When Mr. Birnel's counsel entered the room, the statement ended.

Mr. Birnel was charged by amended information with second degree murder. After a CrR 3.5 hearing, the trial court denied Mr. Birnel's motion to exclude all statements made in the patrol car, the hospital and the interview room. Although the court initially ruled that only Ms. Birnel's acts of violence against Mr. Birnel would be admissible at trial, this ruling was later amended to permit evidence of other violent attacks known to Mr. Birnel. Evidence of Ms. Birnel's reputation for violence when using drugs was also allowed.

At trial, the State argued Mr. Birnel killed his wife out of rage, while Mr. Birnel claimed self-defense. He took the stand, described the struggle in broad terms and denied knowing he stabbed her at all. He claimed her hand never left the knife, even when she was stabbed several times in

the back and on the back of her upper arm. A pathologist testified Ms. Birnel's 31 wounds were found on her head, face, hand, arms, legs, back and chest. Seven wounds were potentially fatal, 19 required medical attention, and 5 were minor. Two wounds entered the lung and broke ribs. The final chest wound, five and one-half inches deep, caused death.

A self-defense instruction was given to the jury—without objection—which required the jury to find imminent danger of harm. The defense objected to only one instruction, which allowed the jury to discard the theory of self-defense if it found that Mr. Birnel was the aggressor. During deliberations, two jurors reportedly reenacted the death struggle. On December 4, 1995, the jury found Mr. Birnel guilty of second degree murder.

Mr. Birnel moved for a new trial, assigning error to the aggressor instruction and alleged juror misconduct. He argued the record did not show that he had made any intentional act reasonably likely to provoke a belligerent response. He also asserted the two jurors, who had expertise in hand-to-hand combat, brought in evidence not obtained at trial. Since Mr. Birnel did not describe in detail the struggle, there was no scene to "reenact." The trial court denied the motion on both grounds.

At the sentencing hearing January 2, 1996, the trial court found that Ms. Birnel had to an extent participated in the crime. On the basis of this mitigating factor (RCW 9.94A.390(1)(a)), the court sentenced Mr. Birnel to 60 months, less than one-half the lower end of the standard range of 123 to 164 months.[1] This appeal followed.

### ADMISSIBILITY OF STATEMENTS

We first address the trial court's admission of statements made in the patrol car, at the hospital, and in the interview room. No one read Mr. Birnel the *Miranda* warnings before

---

[1]Former RCW 9.94A.310; RCW 9.94A.320, .360.

or during the time he was in the patrol car or in the hospital, and he made statements after invoking his Fifth Amendment right to counsel.

■ ■ *Miranda* warnings protect a defendant's right to avoid making incriminating statements while in a custodial police interrogation. *State v. D.R.*, 84 Wn. App. 832, 835, 930 P.2d 350 (citing *State v. Harris*, 106 Wn.2d 784, 789, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987)), *review denied*, 132 Wn.2d 1015 (1997). The necessity for *Miranda* protection arises whenever a suspect is interrogated in custody by an agent of the state. *State v. Warner*, 125 Wn.2d 876, 884, 889 P.2d 479 (1995). It is undisputed that Mr. Birnel was in custody—or reasonably perceived himself to be—from the moment he was placed in the patrol car,[2] that his statements were made in the presence of a state agent, and that he had not received the *Miranda* warnings before the patrol car and hospital statements. It is also undisputed that he made statements after requesting counsel. The remaining question is whether his admissions were the products of an interrogation.

■ ■ For an interview or discussion to be an "interrogation," there must be some degree of compulsion. *Warner*, 125 Wn.2d at 884. An officer's questions or statements will not constitute an interrogation if they are not " 'reasonably likely to elicit an incriminating response' from the suspect." *State v. Breedlove*, 79 Wn. App. 101, 112, 900 P.2d 586 (1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). We ask first whether the officer should have known his or her questions or statements were reasonably likely to elicit an incriminating response, and second whether the questions reflect a measure of compulsion above and beyond that inherent in custody. *State v. Richmond*, 65 Wn. App. 541, 545-46, 828 P.2d 1180 (1992).

■ Although the police detention here was somewhat

---

[2]A defendant is in custody for *Miranda* purposes if he or she reasonably believes his or her freedom of action is curtailed. *State v. Short*, 113 Wn.2d 35, 41, 775 P.2d 458 (1989).

coercive due to the long period Mr. Birnel sat in the patrol car and due to his physical weakness from lack of sleep and the hand injury, no true compulsion is evident. Deputy Lyons asked no questions and merely responded to questions posed by Mr. Birnel. Detective Massong's questions at the hospital about the extent of Mr. Birnel's injuries and sleep the night before were no more than straightforward, nondeceptive attempts to determine his physical and mental state. Neither officer should have expected his conversation to elicit incriminating responses.

Mr. Birnel's statements after he asserted his right to counsel require additional analysis. Once a suspect has asserted the right to counsel, custodial interrogation must cease unless the suspect initiates further communication. *State v. Valdez*, 82 Wn. App. 294, 296, 917 P.2d 1098, *review denied*, 130 Wn.2d 1011 (1996). Even a subsequent waiver of the right is presumed invalid unless the suspect initiates communication. *Id.* at 296 (citing *Michigan v. Harvey*, 494 U.S. 344, 345, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990)). Detective Massong did not initiate a conversation with Mr. Birnel after he asserted his right to counsel. The detective merely began explaining the booking procedure, and Mr. Birnel interrupted with statements about the events of the previous evening. As soon as the statements began, the officer asked Mr. Birnel if he had changed his mind and wanted to talk outside the presence of counsel. Not only did Mr. Birnel waive his right, but he initiated the communication and continued to make his statement after the detective's interruption.

To conclude, none of Mr. Birnel's statements were coerced. Even a confession made in violation of *Miranda* will be admissible if not coerced. *State v. Wethered*, 110 Wn.2d 466, 475, 755 P.2d 797 (1988). Consequently, the trial court did not err in admitting the statements. The State additionally argues that Mr. Birnel cannot challenge the statements made to Detective Massong because the defense put these statements in evidence and the invited error doctrine precludes review. *State v. Henderson*, 114

Wn.2d 867, 870, 792 P.2d 514 (1990). We do not need to reach this issue, but we note that when a party introduces adverse evidence to minimize its prejudicial effect, the invited error doctrine is not applicable. *State v. Whelchel*, 115 Wn.2d 708, 727-28, 801 P.2d 948 (1990).

### Admission of Evidence Relating to the Victim

Mr. Birnel next contends the trial court improperly excluded relevant evidence of Ms. Birnel's violent acts. The court limited the evidence to Ms. Birnel's prior violent acts known to Mr. Birnel. At trial, defense counsel agreed that the test was whether Mr. Birnel knew of the acts of violence, and therefore reasonably perceived a serious threat when Ms. Birnel came at him with a knife. On appeal, he argues the court should have admitted all evidence of Ms. Birnel's violent acts, whether or not Mr. Birnel knew of them.

A trial court's admission of evidence is reviewed for abuse of discretion. *State v. Brown*, 132 Wn.2d 529, 571-72, 940 P.2d 546 (1997). Evidence of a victim's conduct is admissible to show that an accused reasonably feared the victim. ER 404(a)(2); *State v. Fondren*, 41 Wn. App. 17, 25, 701 P.2d 810, *review denied*, 104 Wn.2d 1015 (1985). Ms. Birnel's prior acts of violence were admitted to show that her husband had a reasonable apprehension of harm justifying self-defense. Only those violent acts known to Mr. Birnel are relevant to this defense. He now argues an opposite proposition: that Mr. Birnel did not know the full extent of her aggressive tendencies and therefore did not intentionally provoke the struggle. This defense was not explored at trial and is not the basis for a finding of abuse of discretion on appeal.

### Self-Defense and Aggressor Instructions

Mr. Birnel next challenges two jury instructions, one on self-defense and the other on the aggressor exception to

self-defense. We agree that the self-defense instruction was rejected in *State v. LeFaber*, 128 Wn.2d 896, 913 P.2d 369 (1996) and must be rejected here as well. We also find that the evidence does not support the underlying basis for the aggressor instruction: that the defendant's intentional conduct provoked a foreseeable belligerent response. *State v. Wasson*, 54 Wn. App. 156, 772 P.2d 1039, *review denied*, 113 Wn.2d 1014 (1989).

1. WPIC 16.02 Instruction on Self-Defense. In instruction 10, proposed by the State, the trial court instructed the jury that homicide is justifiable when committed in self-defense and when

(1) The slayer reasonably believed that the person slain intended to inflict death or great personal injury;

(2) There was imminent danger of such harm being accomplished; and

(3) The slayer employed such force and means as necessary and a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of the incident.

This instruction is virtually identical to Washington Pattern Jury Instruction (WPIC) 16.02. *LeFaber* recently held that WPIC 16.02 could easily lead a jury to believe actual imminent harm was required by the provision calling for "imminent danger of such harm being accomplished.' " 128 Wn.2d at 901 (emphasis omitted). Since the standard of self-defense is based on the defendant's subjective, reasonable belief of imminent harm from the victim, and does not require a finding of actual imminent harm, the ambiguity of WPIC 16.02 is misleading. *LeFaber*, 128 Wn.2d at 899, 902-03. The instruction's lack of manifest clarity was deemed erroneous and presumptively prejudicial. *Id.* at 900, 902-03.

A slightly different scenario faces us here. Although

the jury was given the fatally ambiguous WPIC 16.02 instruction on self-defense, it was also given instruction 14, based on WPIC 16.07. Instruction 14 states that

> [a] person is entitled to act on appearances in defending himself and another, if that person believes in good faith and on reasonable grounds that he and another [are] in actual danger of great bodily harm, although it afterwards might develop that the person was mistaken as to the extent of the danger.
>
> Actual danger is not necessary for a homicide to be justifiable.

Division One recently held that when an instruction based on WPIC 16.07 is submitted to the jury along with an erroneous instruction based on WPIC 16.02, such as here, the language of WPIC 16.07 *complements* the ambiguous language of WPIC 16.02, making "clear the subjective nature of the inquiry into 'imminent danger.'" *State v. Bennett*, 87 Wn. App. 73, 80, 940 P.2d 299 (1997), *petition for review filed*, No. 65956-7 (Wash. Aug. 20, 1997). *See also State v. McLoyd*, 87 Wn. App. 66, 939 P.2d 1255 (1997) (same division, same instructions, same result), *petition for review filed*, No. 65995-8 (Wash. Aug. 20, 1997). Division Three just as recently reached the opposite conclusion.

In *State v. Studd*, 87 Wn. App. 385, 942 P.2d 985 (1997), *petition for review filed*, No. 65943-5 (Wash. Sept. 16, 1997), faced with the same two instructions, we held that the instruction based on WPIC 16.02 is reasonably interpreted to require actual imminent danger, while the instruction based on WPIC 16.07 states that a person may act on appearances and actual danger is not necessary. *Studd*, 87 Wn. App. at 389. Since it is impossible to tell which instruction the jury relied on to convict, we held the error prejudicial and reversed the conviction. *Id.* at 389.

Here, the error is even more prejudicial. The WPIC 16.07 instructions in *Studd* and *Bennett* state only that "[a] person is entitled to act on appearances in defending

himself," limiting the issue to self-defense. In the case before us, instruction 14 relates to defense of self "and another," consistent with one defense theory that Mr. Birnel was at least partly motivated by fear that his wife would hurt the child who came upon them fighting. It is possible that a jury could limit its consideration of the "appearances" instruction to the question of whether Mr. Birnel believed "in good faith and on reasonable grounds that he and another [were] in actual danger of great bodily harm . . . ." Instruction 14. In light of that likely interpretation, instruction 10 clearly stands alone, without guidance regarding the imminent harm finding. *LeFaber*, 128 Wn.2d at 903.

For erroneous instructions to require reversal, they must be prejudicial. *Studd*, 87 Wn. App. at 389. Although instruction 10 is presumptively prejudicial, the State may rebut the presumption by proving beyond reasonable doubt that the error was trivial or academic and in no way affected the outcome of the case. *State v. Fowler*, 114 Wn.2d 59, 63, 785 P.2d 808 (1990), *overruled on other grounds in State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991); *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977). The test is whether the jury could have accepted Mr. Birnel's version of events but found him guilty because of the erroneous instruction. *State v. Allen*, 67 Wn. App. 824, 828, 840 P.2d 905 (1992). Given the evidence and the erroneous instruction based on WPIC 16.02, we find that the jury could have believed Ms. Birnel attacked her husband first, but that he was not in actual imminent danger of personal injury or death. Accordingly, we find that the error was not harmless and reverse.

2. Aggressor Instruction. Mr. Birnel strenuously objected to the aggressor instruction given by the court. Instruction 11, based on WPIC 16.04, states that

> [n]o person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was

the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

The State pursued a theory at trial that Mr. Birnel had experienced his wife's drug-induced fury before, knew she did not like him to search her purse, and must have known she would fly into a rage when he confronted her the night of the incident. Mr. Birnel contends this scenario is insufficient to support an aggressor instruction.

We begin by noting that aggressor instructions are not favored. *State v. Kidd*, 57 Wn. App. 95, 100, 786 P.2d 847, *review denied*, 115 Wn.2d 1010 (1990). It is error to give such an instruction if it is not supported by credible evidence from which the jury can conclude that it was the defendant who provoked the need to act in self-defense. *Id.* at 100; *Wasson*, 54 Wn. App. at 158-59. The provoking act must be intentional and one that a jury could reasonably assume would provoke a belligerent response from the victim. *Wasson*, 54 Wn. App. at 159 (citing *State v. Arthur*, 42 Wn. App. 120, 124, 708 P.2d 1230 (1985)).

The evidence does not support an aggressor instruction in this case. Mr. Birnel sat waiting for his wife at the top of the stairs—not an inherently aggressive posture for a confrontation. He asked if she was on drugs and asked if that was where the money was going. Ms. Birnel guessed that he must have searched her purse and found drugs. Even if he knew that his wife did not like him to search her purse, a juror could not reasonably assume this act and these questions would provoke even a methamphetamine abuser to attack with a knife.

The aggressor instruction effectively deprived Mr. Birnel of his ability to claim self-defense. *See Wasson*, 54 Wn. App. at 160. An error affecting a defendant's self-defense claim is constitutional in nature and cannot be deemed harmless unless it is harmless beyond a reasonable doubt. *Kidd*, 57 Wn. App. at 101 n.5 (citing *State v. McCullum*, 98 Wn.2d 484, 497, 656 P.2d 1064 (1983)). Considering

the importance the State assigned to this issue at trial, we cannot assume the error was harmless beyond a reasonable doubt. Consequently, we reverse and remand for a retrial excluding the aggressor instruction.

In light of our holding, we decline to reach Mr. Birnel's issues of juror misconduct and ineffective assistance of counsel, as well as the State's cross-appeal regarding the exceptional sentence.

Reversed and remanded for retrial.

KURTZ and BROWN, JJ., concur.