IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38811-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ELIAS JOSEPH LONGORIA, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J.P.T.* — Elias Longoria appeals his conviction for burglary in the second degree and criminal trespass, challenging the trial court's denial of his motion to suppress statements made during an interview that Mr. Longoria claims was custodial and continued even after he unequivocally requested a lawyer. He also challenges the trial court's denial of a motion in limine and, for the first time on appeal, objects that it was misconduct for the prosecutor to tell jurors in closing argument not to question whether they should have heard certain evidence, since those were "legal issue[s] for the

---

* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.

No. 38811-5-III
*State v. Longoria*

court." 2 Rep of Proc. (2 RP)[1] at 375-76. We find no error or abuse of discretion and affirm.

### FACTS AND PROCEDURAL BACKGROUND

After several break-ins of a small shop that Rodney Christian owns on a 10-acre lot in Quincy, he contacted law enforcement and received advice to install game cameras and remain vigilant.

He did, and on April 8, 2019, the game cameras captured images of two intruders in the shop at around 3:00 a.m. The intruders kicked in the shop door but did not steal anything. On discovering the intrusion the next morning, Rodney repaired the door and recruited his brother, Thomas Christian, and a family friend, Gary Creech, to stand guard at the shop that evening. At around 11:30 p.m. that night, while Thomas and Gary lay in wait, an intruder again kicked in the door and they saw him enter and begin collecting portable lights and extension cords. They confronted the intruder, who immediately dropped his plunder and fled. The next morning, Rodney reported the continuing break-ins to police and provided them with the photos taken by the game cameras.

The responding officer, Deputy Alex Bushy of the Grant County Sheriff's Office, believed he recognized the intruder in the photos as Elias Longoria because of a mole on

---

[1] The report of proceedings is contained in two nonconsecutively paginated volumes. We refer to the volume that contains CrR 3.5 hearing, other pretrial hearings, and the sentencing hearing as 1 RP. We refer to the volume containing the three-day trial as 2 RP.

2

the intruder's left eyebrow. The deputy made several attempts to find and speak with Mr.

Longoria over the next couple of months without success until June 6, when he happened

to be driving by Mr. Longoria's home and saw Mr. Longoria out in his yard. Deputy

Bushy approached Mr. Longoria and questioned him for about 45 minutes about the

burglaries, letting him know that the deputy had recognized Mr. Longoria from

photographs of an intruder. During the questioning, Mr. Longoria admitted he had

entered the shop twice on April 8 but denied that he stole anything. The interview,

including Mr. Longoria's confession, was recorded by the deputy's body camera.

The State charged Mr. Longoria by amended information with two counts of

burglary in the second degree.

*CrR 3.5 Hearing*

Before trial, Mr. Longoria moved the court to suppress the statements he made to

Deputy Bushy on June 6,[2] arguing that they were obtained in violation of his rights under

the Fifth Amendment to the United States Constitution. Deputy Bushy was the only

witness at the suppression hearing.

Deputy Bushy testified that after sighting Mr. Longoria in his yard on June 6, he

parked his patrol car a few houses away and approached him. He was wearing his patrol

uniform. He was accompanied that day by a field training deputy, but the field training

---

[2] Mr. Longoria also moved to suppress statements he made to Deputy Bushy during a traffic stop on June 28 or 29, 2019. The court granted that motion.

deputy stayed behind by the street, about 20 feet away, as Deputy Bushy approached Mr. Longoria. At some point during Deputy Bushy's interview of Mr. Longoria, a Quincy police officer stopped at the scene; as Deputy Bushy explained at the 3.5 hearing, "[I]f I'm gonna be in their city, . . . [t]hey're gonna be curious to what I'm doing. So they pulled up." 1 RP at 58. Like the deputy in training, the Quincy police officer stayed on the street. No patrol lights were engaged on any police vehicle.

Deputy Bushy began recording on his body camera at the outset of his conversation with Mr. Longoria. The video of the nearly 45-minute long interrogation and a stipulated transcript were admitted as evidence at the CrR 3.5 hearing. It was daylight, and Mr. Longoria is seen behind a gate along the side of his home when the deputy approaches. Deputy Bushy calls out for Mr. Longoria by name and asks to chat, adding "You're not under arrest or anything, don't worry." Clerk's Papers (CP) at 6. Mr. Longoria steps out from behind the gate and the two speak in the corner of Mr. Longoria's driveway, up against the gate. They stand about five or six feet away from each other.

Deputy Bushy admitted at the CrR 3.5 hearing that his objective in speaking with Mr. Longoria was to probe him with guilt-seeking questions related to the April burglaries. He started off by asking Mr. Longoria if he could "ask you some questions on a case that I've been investigating." CP at 6. Mr. Longoria expressed reluctance to speak without knowing more. Here and hereafter, we quote the transcript at length, since what

4

was actually said is more helpful than repeating the parties' selective excerpts and

characterizations:

> BUSHY: That's what I'm gonna tell you, so I'm just . . . are you okay with talking right now? At anytime, you can say I'm done and walk away.
>
> LONGORIA: Not really, not if I don't know what you're talking about.
>
> BUSHY: Well, I'm gonna explain it to you and then you can tell me if you want to talk.
>
> LONGORIA: Umm . . . yeah, you can.
>
> BUSHY: Okay, so—
>
> LONGORIA: Am I being under arrest?
>
> BUSHY: No, you're not under arrest. You're not in custody, you're not under arrest, you're not detained. You at any point in time can walk away, tell me go fuck yourself, I mean—
>
> LONGORIA: Okay.
>
> BUSHY: —whatever you want, man. So I'm just . . . so I've met you a couple times, you probably don't remember, it's just been on random . . . I've shown up on a couple of Quincy's traffic stops or umm, I think one time you were driving that, the red Explorer?
>
> LONGORIA: Oh yeah.

CP at 6-7 (alterations in original). Deputy Bushy described one specific traffic stop,

which Mr. Longoria recalled, before turning attention to the burglary investigation.

> BUSHY: So, umm, here's what I'm working with. A couple, it's been awhile now, uh, maybe two months ago we had some burglaries going on up Adams Road and then once you get up Adams, you turn on Thirteen and there's some houses back there.
>
> LONGORIA: Yeah.
>
> BUSHY: So there's a house back [there] that got burglarized several different times. Umm, the subjects at the house, they had a couple things

5

stolen.  They decided to install game cameras.  So do you know what those are?  Like trail cameras for hunting but people use them for security, too?

LONGORIA: Yeah.

BUSHY: So these things were installed in belief that the burglar was gonna come back and they were gonna catch him on tape.  So, the . . .  and I'll just lay it straight out to you, okay?  The subject did come back with another subject.  I got multiple videos[3] and pictures of the subjects.  And I can tell you right now, I've I.D.'d one subject.  The other subject I'm like ninety-nine percent but I'm not a hundred, okay?  So, I will tell you right now you were one and I'm not gonna say the name of the other one because I'm not a hundred percent yet and I'm not gonna put someone in that spot, but you were one of 'em.  There's a picture of you looking literally straight up at the camera and and plain as day, okay?

So, what I would like to know is if you're willing to have an interview with me regarding this incident.  This is gonna go a long way to help me with your situation.

CP at 7-8 (second alteration in original).  Mr. Longoria asked when the interview would happen and Deputy Bushy told him, "[a]t any point in time," and, "I mean we can have an interview right now."  CP at 8.  In response, Mr. Longoria asked about an attorney:

LONGORIA: Could I have a lawyer present?

BUSHY: If you want to do that, that's what you can do.  I will tell you that since you're gonna, if you want to decline to have, decline the interview at this point, then I'll just, with your lawyer, that can be, you can have that go for you in court.  Okay?  So I'm giving you the opportunity right now to talk to me about it if you want.

If you do not, I'm just gonna take the report and say, Elias refused to comment regarding the investigation, said he'd rather have a lawyer with him and then say I'm forwarding this report to the prosecutor's office for further review of charges of burglary, theft of motor vehicle and—

---

[3] The game cameras did not in fact capture any video footage.

CP at 8-9. Mr. Longoria denied the theft allegation, saying that he never took a motor

vehicle or motor bike. Deputy Bushy continued:

> BUSHY: Okay, well, maybe it's not on you on that. Maybe that's on the other subject, okay? But I do have you . . . you actually, eye witnessed and I.D.'d by the victims[4] as well. They were inside. And I'm not gonna tell you you're not gonna remember that because you do. They were inside. They were in the car waiting which you drove up there on your little, on the gold BMX bike and you had to ditch and run cuz they confronted you in the shop. Okay?
> So, it's up to you on whether you want to talk to me about it. If you don't, then I'm just gonna go forward and throw it to the prosecutor's office for them to finalize all the charges and go further with it on court. So, what's your thoughts? What would you like to do?

CP at 10. Again, Mr. Longoria asked about having a lawyer:

> LONGORIA: Well, I'd rather have a lawyer with me, I mean before I say anything. Wouldn't that be the smart thing to do?
> BUSHY: It's completely up to you. Whether you talk to me about your side of it, what was going on, what was going through your head during that investi- or during that incident up there.
> LONGORIA: I mean yeah, I mean . . . cuz I didn't take nothing.

CP at 10 (alteration in original). Deputy Bushy asked, "But you were still up there? I

mean you're still going into someone's, someone's property, on several times." CP at 10.

Mr. Longoria confessed that he had been at the property, explaining that his friend

told him during a carpool that he wanted to "go up there and check it out." CP at 11. Mr.

Longoria knew that his friend was interested in stealing a safe inside the shop and

admitted to Deputy Bushy that he "walked in and looked around" the shop and then left.

---

[4] The victims never identified Mr. Longoria as the intruder.

7

CP at 15.  When the deputy pressed Mr. Longoria about whether he returned to the shop,

Mr. Longoria confessed "I went back by myself" the next day.  CP at 19.  He told the

deputy, "I don't know what I was thinking" and "I was just gonna get like those copper

wires or whatever, but I didn't."  CP at 19.  Mr. Longoria expressed remorse for entering

the shop and told the deputy he felt his life had changed since then.

From here, the conversation shifted to questions about the stolen property from the

shop and whether Mr. Longoria knew where it was.  Mr. Longoria denied any

involvement with the stolen property but offered that he could try to figure out where

some of it was.  He thought he may have text messages and photographs to share with the

deputy about a different theft.  Mr. Longoria tried to find where a deleted photograph

might be stored in his phone, as Deputy Bushy offered suggestions, when the phone

suddenly died.  Mr. Longoria offered to retrieve a portable charger from his home and

walked behind his gate.[5]  While waiting for Mr. Longoria's return, Deputy Bushy walked

to the street and spoke with the field training deputy at the foot of the driveway.

At this point in the video, the Quincy police officer comes to stand with the two

deputies at the end of the driveway.  Mr. Longoria returns outside to look for his house

keys in his truck on the street.  Unable to find his keys outside, Mr. Longoria once again

retreats behind his gate.  He eventually returns with a phone charger and continues to talk

---

[5] The transcript of the interview states that Mr. Longoria said, "Yeah, I don't have
a portable charger," but on the audio trial exhibit, one hears, "Yeah, let me grab a
portable charger."  *Compare* CP at 37 *and* Trial Ex. P2, at 34 min., 39 sec.

with Deputy Bushy one-on-one at the gate about the other stolen property. As the conversation winds down, Mr. Longoria asks whether the charges against him may be dropped if he were able to find the stolen property. Deputy Bushy makes no explicit promises and thanks Mr. Longoria for his help.

Deputy Bushy acknowledged on cross-examination that he believed he had probable cause to arrest Mr. Longoria before the questioning began. Asked why he did not initiate an arrest, the deputy explained that it was sheriff's office policy not to arrest a person for a property crime that occurred more than a week earlier, and to instead investigate and file a report with the prosecutor's office. When asked about his professional training about *Miranda*,[6] Deputy Bushy testified that he was trained to give a *Miranda* warning when someone is "detained or in custody." 1 RP at 75. Deputy Bushy did not give Mr. Longoria a *Miranda* warning during the interrogation.

At the close of the evidence, the State argued that *Miranda* did not apply because Mr. Longoria was not in custody. It further argued that because he was not in custody, he could not anticipatorily invoke his right to counsel. In response, Mr. Longoria argued that he was in custody and had unequivocally invoked his right to counsel.

The court ruled that the June 6 statements would be admissible at trial. It later entered findings or fact, conclusions of law and an order memorializing its ruling.

---

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Trial*

Before trial, Mr. Longoria moved for an order in limine excluding "the particulars of how Deputy Bushy knows the defendant." CP at 92. He asked that the identification "be limited to that Deputy Bushy was familiar with what defendant looked like as a result of a traffic stop." *Id.* In fact, the State represented, Deputy Bushy had had 15 to 20 contacts with Mr. Longoria between 2012 and 2019. After confirming that the stops were all social contacts or traffic stops, the court denied the motion, finding it highly relevant "that Deputy Bushy has had regular contact and that's how he recognized [Mr. Longoria] so easily" and that any prejudice would be minimal as long as Deputy Bushy made clear that they were "social and traffic contacts." 2 RP at 24.

In addressing the State's motions in limine, defense counsel expressed concern that a request by the State to exclude self-serving statements by Mr. Longoria was related to a significantly redacted, roughly 10-minute version of the body cam video that the State proposed to offer. He persisted in the defense position that the entire interview should be suppressed, but argued that if Mr. Longoria's *inculpatory* statements were to be admitted, "I'll be requesting, pursuant to [ER] 106, to allow the whole statement in." 2 RP at 13.

The prosecutor responded that in making redactions to the video, "I actually tried to be fair and anticipating what would be excluded under the evidence rules most likely and what would be relevant." 2 RP at 14. He continued, however, "If he wants to bring

10

in the entire video, I frankly don't have any problem with that." *Id.* With the parties in agreement, the court ruled that the entire video would be played if introduced.

During the three-day jury trial, the State called as witnesses Rodney and Thomas Christian, Gary Creech, and Deputy Bushy. The State offered and played for the jury the entire, unredacted video of the June 6 interrogation. The defense called no witnesses.

During closing argument, the prosecutor commented on the fact that the body camera video included statements by Mr. Longoria about whether he could or should have a lawyer. Referring to one of the court's instructions about its rulings on evidence, he told jurors, "I don't want you to have to go into deliberations and have discussions about whether . . . statements from defendant should have been admitted from the body camera. . . . That's a legal issue for the court. You guys don't have to worry about it." 2 RP at 375. The defense did not object.

Defense counsel argued in closing that the jury should not convict Mr. Longoria of the burglary charges, as the State failed to prove he entered the shop with a criminal intent. He urged the jury to find Mr. Longoria guilty of only the lesser included charges of first degree criminal trespass.

The jury found Mr. Longoria guilty of one count of burglary in the second degree and one count of first degree criminal trespass. He appeals.

ANALYSIS

Mr. Longoria assigns error on appeal to the denial of his motion to suppress, to alleged prosecutorial misconduct during closing argument, and to denial of his motion to exclude evidence of his prior contacts with Deputy Bushy. We address the assigned errors in the order presented.

I.      THE TRIAL COURT'S MATERIAL FINDINGS AT THE SUPPRESSION HEARING ARE
        SUPPORTED BY SUBSTANTIAL EVIDENCE AND SUPPORT ITS CONCLUSION THAT
        THE EVIDENCE OF THE JUNE 6 INTERVIEW WAS ADMISSIBLE

        A.      *The trial court's material findings are supported by substantial evidence*

Following a CrR 3.5 hearing, the court creates a record of undisputed and disputed facts, conclusions as to disputed facts, and its conclusion as to admissibility and the reasons therefor. CrR 3.5(c). A challenge to a trial court's refusal to suppress a defendant's statement requires us to review any challenged findings of fact for substantial evidence and to review de novo whether his statements were freely and voluntarily given. *State v. Butler*, 165 Wn. App. 820, 827, 269 P.3d 315 (2012).

Mr. Longoria assigns error to three of the trial court's findings of fact, but two of them (2.1 and 2.19) are addressed only in a footnote, which points out that they erroneously reflect "June 5, 2019" as the date of the recorded interview. Br. of Appellant at 6, n.2. Apart from those immaterial errors, he challenges only finding 2.11, which states:

12

2.11 Deputy Bushy responded to Defendant's question about the lawyer, responding that he (Defendant) could do that, and Deputy Bushy informed Defendant how he would proceed with the investigation either way.

CP at 96.

Mr. Longoria contends, instead, that the deputy "informed Mr. Longoria he would proceed if Mr. Longoria declined the interview and decided he would rather have a lawyer," but "insinuated a different result would occur if Mr. Longoria spoke with Bushy without a lawyer." Br. of Appellant at 20. The gist of this undeveloped argument (the "different result" allegedly insinuated is not identified) appears to be that contrary to the court's characterization of the deputy's response, Deputy Bushy presented Mr. Longoria with a false choice: do not speak, and the investigation continues; speak, and the matter will be dropped.

The record does not support argument that Deputy Bushy insinuated the investigation would be dropped if Mr. Longoria spoke to him. Why would the deputy be seeking information from Mr. Longoria if it was not his intention to continue the investigation "either way?" The trial court's finding is a reasonable characterization of what Deputy Bushy communicated to Mr. Longoria. Because this finding is supported by substantial evidence, it, like the unchallenged findings, is a verity for purposes of reviewing the conclusions of law. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

B.       *The findings support the trial court's conclusion that Mr. Longoria was not in custody when interrogated by Deputy Bush*

*Miranda* warnings were designed to protect a defendant's right not to make incriminating statements while in police custody. *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004) (citing *State v. Harris*, 106 Wn.2d 784, 789, 725 P.2d 975 (1986)). They are required when an interrogation or interview is (1) custodial (b) interrogation (c) by a state agent. *Id.* The trial court found that Mr. Longoria's confession was obtained during an interrogation by a state actor; at issue is only whether Mr. Longoria was in custody at the time of the interrogation.

In *Berkemer v. McCarty*, the United States Supreme Court narrowed "custody" to circumstances where "'a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)). The Washington Supreme Court has adopted *Berkemer*'s approach. *Lorenz*, 152 Wn.2d at 37 (citing *Harris*, 106 Wn.2d at 789-90; *State v. Short*, 113 Wn.2d 35, 41, 775 P.2d 458 (1989)). It summarized the salient characteristics of "custody" in *State v. Escalante*, 195 Wn.2d 526, 533-34, 461 P.3d 1183 (2020):

> [E]ven if a person is "seized" within the meaning of the Fourth Amendment—such that a reasonable person in their position would not feel free to leave or otherwise terminate the encounter with law enforcement—they are not necessarily in "custody" for *Miranda* purposes. [*Berkemer*, U.S. 468] at 442. Ultimately, in *Miranda* case law, "'custody' is a term of art that specifies circumstances that are thought generally to present a

14

serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012).

The custody inquiry is an objective one that asks how a reasonable person in the suspect's position would have understood the circumstances. *Berkemer*, 468 U.S. at 442. To determine whether a reasonable person in the suspect's position would feel restrained to the degree associated with formal arrest, a court examines the totality of the circumstances. Relevant circumstances may include the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning. *See, e.g.*, *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001); *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). The subjective views of the interrogating officers are irrelevant, except to the extent those views are communicated to the suspect in some way and would influence a reasonable person's perception of the situation. *Stansbury v. California*, 511 U.S. 318, 323-25, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

In *Berkemer*, the Court concluded that a person detained during a traffic stop was not in custody for *Miranda* purposes. 468 U.S. at 442. The Court reasoned that "[t]wo features of an ordinary traffic stop mitigate the danger" that a person will be compelled to speak against their will. *Id.* at 437. First, an ordinary traffic stop is "presumptively temporary and brief," in contrast to the frequently prolonged station house interrogations that were addressed in *Miranda*. *Id.* at 437-38. Second, the atmosphere surrounding an ordinary traffic stop is substantially less police-dominated than the interrogations in *Miranda*. *Id.* at 438-39. A driver is typically confronted by one or at most two police officers, and "most importantly, the typical traffic stop is public," so that "[p]assersby, on foot or in other cars, witness the interaction of [the] officer and motorist." *Id.* at 438. The public nature of a typical roadside stop reduces the ability of a police officer to use improper means to elicit a confession and reduces a driver's fear that they will be abused if they do not cooperate. *Id.*

(Alterations in original.)

A factor that defense counsel emphasized in the trial court—the existence of probable cause—is not relevant.[7] *See Heinemann v. Whitman County*, 105 Wn.2d 796, 807-08, 718 P.2d 789 (1986) (citing *Berkemer*, 468 U.S. at 435 n.22). It is also irrelevant whether the interrogation was held in a coercive environment. *Lorenz*, 152 Wn.2d at 37.

Relevant findings from Mr. Longoria's suppression hearing that are verities on appeal include its finding that Mr. Longoria "was walking into his backyard and Deputy Bushy asked Defendant if Defendant had time to talk to Deputy Bushy about a burglary investigation." CP at 95. They include its finding, "During the conversation, Defendant and Deputy Bushy were about five or six feet away from each other, it was still daylight, and there was one other officer around the scene, possibly another [officer] as well, though not right in the area where Defendant and Deputy Bushy were having a conversation." *Id.* They include its finding, "Deputy Bushy told Defendant that Defendant was free to walk away or ask Deputy Bushy to step off Defendant's property at any time and that Defendant could stop talking at any time and that Defendant did not have to answer any questions." *Id.* They include its finding that when Mr. Longoria said he would rather have a lawyer with him before saying anything, and "Wouldn't that be

---

[7] Even the State miscites Washington law on this point, relying on a summary of the law from the Washington Practice series that has been corrected or updated. Br. of Resp't at 10; *see* 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE CRIMINAL PRACTICE & PROCEDURE § 3309 (3d ed. 2004 suppl. 2022) ("The existence of probable cause to arrest is *no longer a factor* for consideration in determining whether an interrogation is custodial in nature." (emphasis added)).

the smart thing to do?" *Id.* at 96. "Deputy Bushy again responded by giving Defendant

the choice as to whether Defendant wanted to have a lawyer with him by stating, "It's

completely up to you. . . ." *Id.*

Mr. Longoria encourages us to find contrary facts, but the "absence of a finding of

fact in favor of the party with the burden of proof as to a disputed issue is the equivalent

of a finding against the party on that issue." *Yakima Police Patrolmen's Ass'n v. City of

Yakima*, 153 Wn. App. 541, 562, 222 P.3d 1217 (2009). The bodycam video strongly

supports the testimonial support for the trial court's findings about the open, public

setting and the lack of a police presence or other circumstances suggestive of formal

arrest.

Mr. Longoria argues that the Washington Supreme Court's decision in *State v.

Sum*, 199 Wn.2d 627, 653, 511 P.3d 92 (2022), holds that courts must consider a person's

race and ethnicity in the totality of circumstances reviewed to determine if a reasonable

person would believe they were free to leave. Br. of Appellant at 16. The decision in

*Sum* was filed in June 2022, a year after the CrR 3.5 hearing in this case. It addressed a

"seizure," under article I, section 7 of the Washington Constitution, and applied

reasoning from other cases and contexts that an "objective observer" is aware that

"implicit, institutional, and unconscious biases, in addition to purposeful discrimination,

have resulted in disproportionate police contacts, investigative seizures, and uses of force

against Black, Indigenous, and Other People of Color . . . in Washington." *Sum*, 199

Wn.2d at 631. In the "seizure" context, it held, relevant considerations include, among others, "'the number and types of questions posed' or requests made of the allegedly seized person, and the extent to which similar law enforcement encounters are 'disproportionately associated with a race or ethnicity.'" *Id.* at 654 (quoting GR37(g)(i), (iv).

Aspects of the analysis in *Sum* could have application in Fifth Amendment cases like this one, but Mr. Longoria does not provide a disciplined analysis of how any particular aspect of *Sum* applies in this appeal. He engages in no *legal* analysis of how the state constitutional analysis in *Sum* translates to the Fifth Amendment context, in which Washington applies *Berkemer*. Nor does he address the difference in the interests involved. A significant interest addressed in *Sum* (arguably the most significant) is that "[w]hen it comes to police encounters without reasonable suspicion, 'it is no secret that people of color are disproportionately victims of this type of scrutiny.'" *Id.* at 644 (quoting *Utah v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting)). Justice Sotomayor emphasized that she was speaking of "*suspicionless* stop[s], one in which the officer initiated this chain of events without justification." *Strieff*, 579 U.S. at 254. While people of color might be disproportionately subject to custodial interviews, it cannot be said to be a matter of common understanding, as it is in the seizure context.

18

In this case, the trial court was never asked to consider Mr. Longoria's race or ethnicity at the suppression hearing. That he had a Spanish surname was apparent; otherwise, the relevant record is silent.[8] Even on appeal, Mr. Longoria makes no effort to identify numbers of questions, types of questions, requests, or anything else about Deputy Bushy's interview that should have caused the trial court to conclude—on its own, without request or suggestion by defense counsel—that an objective observer, aware of implicit, institutional, or unconscious bias, would view Mr. Longoria's freedom of action during the interview at the top of the driveway to his home as curtailed to a degree associated with formal arrest.

The trial court's findings support its conclusion that Mr. Longoria was not in custody.

C.    *The trial court's findings support its conclusion that Mr. Longoria's questions were not unequivocal requests for an attorney*

Mr. Longoria also challenges the trial court's conclusions that Mr. Longoria's questions "Could I have a lawyer present?" and, "Well, I'd rather have a lawyer with me, I mean before I say anything. Wouldn't that be the smart thing to do?" did not constitute unequivocal requests for an attorney.

---

[8] The judgment and sentence revealed, "Race: White (Caucasian)" and "Ethnicity: H," but it was entered in March 2022, nine months after the suppression hearing. CP at 146 (boldface omitted).

Once an accused person asserts his right to consult an attorney, the current interrogation must stop and police may not approach for further interrogations until counsel has been made available. *See Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990). To invoke *Miranda*, the request for counsel must be unequivocal and unambiguous. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *State v. Radcliffe*, 164 Wn.2d 900, 906, 194 P.3d 250 (2008). A statement either is "'an assertion of [*Miranda* rights] or it is not.'" *Davis*, 512 U.S. at 459 (quoting *Smith v. Illinois*, 469 U.S. 91, 97-98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984)). The inquiry is an objective one that asks whether "a reasonable police officer in the circumstances would understand the statement to be [an invocation of *Miranda* rights]." *Id.*

Mr. Longoria relies on three federal decisions in which the suspect's questions about having an attorney were held to be unequivocal requests for counsel. *See* Br. of Appellant at 24-25. The State responds with 10 decisions holding that similar questions or comments about possibly needing counsel were not, including *Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer."); *Radcliffe*, 164 Wn.2d at 902 ("I didn't know how much trouble I'm in, and I don't know if I need a lawyer."); and *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 756, 249 P.3d 857 (2013) (when told by his interrogators that he would not be in custody if they did not have probable cause, defendant responded,

20

"I mean I guess I'll just have to talk to a lawyer about it and, you know, I'll mention that you guys are down here with a story").

Turning to the trial court's reasoning in this case, it was after Deputy Bushy explained that he was investigating a burglary and asked if Mr. Longoria was willing to have an interview that Mr. Longoria asked, "Could I have a lawyer present?" CP at 8. Deputy Bushy responded "If you want to do that, that's what you can do." CP at 9. He explained that in that event, he would forward the information he had to the prosecutor. As the trial court found, a reasonable police officer in Deputy Bushy's circumstances would understand that with this first question, Mr. Longoria was only asking whether a lawyer was permitted to be present during the interview. It would not be perceived as a statement that Mr. Longoria wanted a lawyer in attendance. *See McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 ("[To invoke the *Miranda* right to counsel] requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (emphasis omitted)).

Deputy Bushy's explanation of the suspected crimes he would be forwarding to the prosecutor prompted questions and comments by Mr. Longoria. After responding to those questions and comments, the deputy said to Mr. Longoria, "So, what's your thoughts? What would you like to do?" CP at 10. To this, Mr. Longoria replied, "Well,

21

I'd rather have a lawyer with me, I mean before I say anything. Wouldn't that be the smart thing to do?" CP at 10.

As the trial court observed in its oral ruling, the statement about "rather hav[ing] a lawyer with me" "initially seems fairly unequivocal, but then right after, before Deputy Bushy responds, [Mr. Longoria] said 'wouldn't that be the smart thing to do,' which then throws it a little bit back into the unequivocal category." 1 RP at 98. And Deputy Bushy's response was, "It's completely up to you," after which Mr. Longoria began to provide information without further mention of having a lawyer. CP at 10.

The first of the three cases that Mr. Longoria cites to challenge the trial court's analysis is *Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999). Alvarez was questioned at a jailhouse, and there were "40-50 signs posted throughout the jail area informing arrestees of the around the clock availability of *Miranda* duty lawyers. Alvarez was not taken through this area." *Id.* at 998 n.3. After being read his *Miranda* warnings, he asked three questions to which, the Ninth Circuit observed, "[t]he correct answer to each . . . was a simple unambiguous 'yes.'" *Id.* at 998. Instead, he received the following answers to his questions:

> MILLER: "Okay. Do you wanna give up the right to remain silent? Mario, you wanna talk to us about this incident?"
> ALVAREZ: **"Can I get an attorney right now, man?"**
> MILLER: "Pardon me?"
> ALVAREZ: **"You can have attorney right now?"**

MILLER: "Ah, you can have one appointed for you, yes."

ALVAREZ: **"Well, like right now you got one?"**

MILLER: "We don't have one here, no. There's not one present now."

LANGE: "There will be one appointed to you at the arraignment, ah, whether you can afford one. If you can't one will be appointed to you by the court."

*Id.* at 185 F.3d 995, 996-97. Alvarez then said, "I'll talk to you guys" and proceeded to provide incriminating information.

The district court rejected Alvarez's habeas corpus petition based on its conclusion that the officers believed Alvarez was merely asking questions and answered his questions in good faith. The Ninth Circuit panel disagreed. Because the officers knew in Alvarez's situation that an attorney *was* available "right now," but refused, three times, to answer that exact question, the panel explicitly disagreed with the district court's conclusion about the officers' good faith. *Id.* at 998.

The second case relied on by Mr. Longoria is *United States v. de la Jara*, 973 F.2d 746 (9th Cir. 1992). De la Jara was a Peruvian businessman who had a lawyer at the time he was arrested and was interrogated; indeed, a letter from his lawyer was an item uncovered in a search of his home at the time of his arrest. At the suppression hearing, de la Jara testified that he had asked officers if he could speak to his attorney several times, saying, "I should have my lawyer present." *Id.* at 751. He also testified that he told his secretary to call his attorney, but she said she was unable to do so; at the suppression hearing, she corroborated his version of events, testifying that he asked her twice to call

23

his attorney, but she was prevented from doing so by the officers who were on site for the arrest and search. *Id.*

A police report prepared by Santa Ana Police Officer Perez four days after the execution of the search warrant stated,

> I stood by the front of DELAJARA's office along with an unknown agent. DELAJARA was being uncuffed by Agent Rivera. I started to close the door slightly when I heard DELAJARA say in Spanish that he wanted to call his attorney. I told the agent who was standing outside the office that it sounded like DELAJARA was invoking his rights because he just asked to call his attorney. The agent asked me if that's what I heard and I said "yes."

*Id.* An Assistant United States Attorney later drafted a declaration for Officer Perez that retreated from the report's statement of what the officer "heard DELAJARA say in Spanish" and asserted that he only heard "speak to an attorney" and assumed de la Jara was invoking his right. *Id.* Officer Perez's in-court testimony tracked the declaration and was accepted by the district court over his contemporaneous report, leaving the Ninth Circuit with "a definite and firm conviction that the court erred in doing so." *Id.*

In his recorded interrogation, de la Jara made a statement in Spanish that the interpreter said could have three different meanings depending on inflection and to some extent on context: "Can I call my attorney?", "Should I call my attorney?", or "I should call my lawyer." *Id.* at 750. The Ninth Circuit held that "Should I call my attorney?" "might not even constitute an equivocal invocation, and thus might require no clarification by the interrogating officers." *Id.* at 751 (citing *Norman v. Ducharme*,

24

871 F.2d 1483, 1484, 1486 (9th Cir. 1989)).  It would regard the other two meanings as unequivocal requests, however.  *Id.* at 750.  The Ninth Circuit concluded that "de la Jara's words understood as ordinary people would understand them, and as Officer Perez did understand them, clearly invoked the right to counsel."  *Id.* at 752.

Finally, Mr. Longoria relies on *Smith v. Endell*, 860 F.2d 1528 (9th Cir. 1988).  In that case, Smith was arrested for possession of cocaine and was questioned by state troopers.  *Id.* at 1529.  He was advised of his *Miranda* rights, waived them, and discussed the drug charges with the troopers for approximately an hour.  At that point, Smith was asked if he had shot Ron Cole, who he had identified as his supplier and to whom he admitted owing $15,000.  He denied it, but when pressed, said,

> Can I talk to a lawyer?  At this point, I think maybe you're looking at me as a suspect, *and I should talk to a lawyer.*  Are you looking at me as a suspect?

*Id.* (emphasis added).

The troopers did view Smith as a suspect and, the Ninth Circuit held, questioning should have stopped:

> Smith's initial request was clear enough: if the troopers regarded him as a suspect in the murder of Ron and Darcelle Cole, he wanted an attorney. The request was not ambiguous; Smith was uncertain whether the troopers considered him a suspect, but if they did, his intent was clear: "I should talk to a lawyer."  In this respect his statement was not equivocal; there was no "might" or "maybe" or "perhaps."

> We agree with the magistrate that Smith's request was conditional; it was not to be operative unless the troopers suspected Smith of the murders; if

25

they did, however, Smith wanted counsel. The troopers could not have
mistaken Smith's meaning. Since they knew him to be a suspect,
questioning should have stopped until an attorney was present, unless
Smith himself initiated its renewal.

*Id.* at 1531-32 (footnotes omitted). A later, more equivocal statement by Smith about

whether he wished to have counsel proved immaterial, given what the Ninth Circuit

found to be the clarity of his first request.

The three decisions relied on by Mr. Longoria are not helpful to him. Each

involves either clearly unequivocal statements or circumstances in which the appellate

court had reasons for rejecting the interrogating officers' professed belief that they were

merely being asked questions that they fairly answered. Those circumstances are not

demonstrated here.

The trial court's findings of fact support its conclusion that Mr. Longoria did not

make an unequivocal request for an attorney.

II.     PROSECUTORIAL MISCONDUCT

Mr. Longoria's next assignment of error complains for the first time on appeal that

the prosecutor committed reversible misconduct in directing the juror's attention to the

court's instruction not to speculate about evidentiary rulings.

In closing argument, the prosecutor began with what he referred to as the "to

convict" instructions and identified the evidence that he believed proved the elements of

burglary in the second degree.  He then directed the jury's attention to one of the

paragraphs of the court's instruction 1.  The first three sentences of that paragraph state:

> One of my duties has been to rule on the admissibility of evidence.
> Do not be concerned during your deliberations about the reasons for my
> rulings on the evidence.  If I have ruled that any evidence is inadmissible,
> or if I have asked you to disregard any evidence, then you must not discuss
> that evidence during your deliberations or consider it in reaching your
> verdict.

CP at 100.

The prosecutor addressed only the first couple of sentences of that part of the

instruction, telling jurors:

> There is—I would like to go back to Instruction No. 1, and I'm
> going to kind of jump around here, and I apologize.  It's the second
> paragraph from the bottom that starts, ["]as one of my duties["].
>
> So this is the judge's instruction and it says, ["]one of my duties has
> been to rule on the admissibility of evidence.  Do not be concerned during
> your deliberations about the reasons for the rulings on that evidence.  If
> I["], meaning the judge, ["]have ruled any evidence—["].  I don't have to
> get to that point.
>
> So those first couple sentences, I bring this up only because, you
> know, I don't want you to have to go into deliberations and have
> discussions about whether certain statements from defendant should have
> been admitted from the body camera.  A couple times he refers to asking
> for a lawyer.  And you might think, well, Deputy Bushy should have
> stopped and we shouldn't be considering this interview and what was said.
> That's a legal issue for the court.  You guys don't have to worry about it.  If
> it's been said in court, and assuming there was an objection or it was
> stricken, then that's the evidence.  And you guys get to consider that.  It's
> part of your deliberations.
>
> The whole lawyer thing, you don't have to worry about.  Because
> that's a legal issue.  But all you have to worry about is the evidence that has
> been presented.

27

2 RP at 375-76.

Mr. Longoria never objected to that argument at trial. On appeal, however, he

characterizes the argument as improper for several reasons:

> The prosecution's arguments improperly drew attention to and commented on Mr. Longoria's right to counsel. Such improper comments also invited the jury to consider Mr. Longoria's invocation of counsel as evidence of guilt.
>
> In doing so, the prosecution also improperly vouched for the reliability of Mr. Longoria's statements following his requests to talk to a lawyer. It urged the jury to infer Deputy Bushy had done nothing wrong by continuing in his interrogation of Mr. Longoria, despite Mr. Longoria's requests to talk to a lawyer. . . . It asked the jury to rely on those statements to find Mr. Longoria guilty.

Br. of Appellant at 34-35.

As earlier explained, Mr. Longoria's questions about whether he could or should

have a lawyer for the interview would never have been heard by jurors had the video

been redacted of all objectionable material, as it could have been. But to ensure that

jurors heard statements by Mr. Longoria that the defense *wanted* them to hear, it relied on

ER 106 to argue that the video should be played in full. The State agreed, and the trial

court accepted the parties' agreement, so the jury heard everything.

To prevail on a claim of prosecutorial misconduct, the defendant must establish

that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*,

172 Wn.2d 438, 442, 258 P.3d 43 (2011). The challenged conduct is reviewed in the

context of the total argument, the issues in the case, the evidence addressed in the

28

argument, and the instructions given. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). "[F]ailure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Id.* at 86. A reviewing court should affirm the conviction unless the defendant shows "substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *Id.*

It is simple to read the prosecutor's challenged argument as what the State says it was: an argument, to avoid juror confusion, that jurors should not try to apply their lay understanding of *Miranda* to divine what should have happened when Mr. Longoria asked whether he could, or should, have a lawyer.

We are unable to find in that argument *where* the prosecutor suggested that jurors should find Mr. Longoria guilty based on his questions about having an attorney. We are unable to find where he vouched for the truth of everything Mr. Longoria said after asking those questions. Mere references to constitutional rights are not necessarily comments on those rights. *State v. Burke*, 163 Wn.2d 204, 216, 181 P.3d 1 (2008).

The prosecutor's argument might have left jurors with the impression that, outside their presence, the court ruled that Deputy Bushy did nothing wrong by continuing his questioning. But if that would have been a slight misunderstanding, the prosecutor appears to have been trying to keep his argument on this point short and simple. Mr. Longoria fails to demonstrate that a more precise explanation of what happened—that the

court ruled Mr. Longoria's confession admissible, and everything else (including references to an attorney) came in at the request of the defense— would have been fairer, and more acceptable to the defense. In any event, Mr. Longoria fails to show how he was prejudiced or that a curative instruction could not have cured any prejudice.

Prosecutorial misconduct is not shown.

III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION IN LIMINE

Mr. Longoria's final assignment of error is to the denial of motion in limine in which he asked the court to limit Deputy Bushy's testimony about the basis on which he recognized Mr. Longoria in the surveillance photographs to "that Deputy Bushy was familiar with what the defendant looked like as a result of a traffic stop." CP at 92. The trial court denied the motion, viewing the many contacts as highly relevant to the reliability of the deputy's identification, and the fact that they were merely traffic stops or social contacts as not prejudicial. Based on the trial court's ruling, the evidence heard by the jury was the following:

> Q. And you previously seen Exhibits 19 through 26, those were the ones of the subjects in Rodney's shop?
>
> A. Yes.
>
> Q. And did you recognize anyone in those photos?
>
> A. Yes. I recognized the defendant.
>
> Q. And how did you recognize him?
>
> A. Specifically, the mole on his left eyebrow.
>
> Q. And have you had prior contacts with the defendant?

A.     Yes, I have.

Q.     Can you just briefly tell us about how many?

A.     Probably about 15 to 20 prior contacts.

Q.     And those were traffic stops, social contacts?

A.     Yes.

Q.     And part of those was with your time with Quincy P[olice ]D[epartment].

A.     Yes.

Q.     So going back some years.

And do you see that person here in the courtroom today?

A.     I do.

2 RP at 308-09.

Mr. Longoria argues on appeal that "prior act evidence, including prior contacts with law enforcement, is presumptively inadmissible under ER 404(b)," and "[e]ven if admitted for a proper purpose . . . evidence of prior acts is impermissible [under ER 403] if the probative value of such evidence is substantially outweighed by the danger of unfair prejudice." Br. of Appellant at 42. We review the trial court's evidentiary rulings for abuse of discretion. *State v. Dillon*, 12 Wn. App. 2d 133, 146, 456 P.3d 1199 (2020) (citing *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014)).

ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The evidence of Deputy Bushy's contacts was not being offered to show that some act by Mr. Longoria was "in conformity with" the 15 or 20 prior traffic stops or

31

social contacts. It was being offered for the expressly permitted purpose of proving identity. *See* ER 404(b).

Mr. Longoria fails to demonstrate a danger of unfair prejudice that substantially outweighed the probative value of the fact that the deputy's identification of Mr. Longoria was based on that many contacts.

For the first time on appeal, Mr. Longoria contends that his identity was not at issue because he confessed when interviewed by Deputy Bushy that he had trespassed the shop. Reply Br. of Appellant at 22-23. He never offered to stipulate to being an individual captured by the surveillance images, however, and he remained free until the conclusion of the trial to argue mistake or some other basis for disavowing his admission during the interview.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.P.T.

WE CONCUR:


_____          _____
Fearing, C.J.                            Lawrence-Berrey, J.